**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**WENDY J. HAY,**

                         **Plaintiff,**

      **vs.**

**BURNS CASCADE CO., INC, DAVID S. BURNS,**
**DAVID MONAHAN, DAVID DOING, and**
**TIMOTHY MURPHY,**

                  **Defendants.**
_____

                                **5:06-CV-0137**
                                **(NAM/DEP)**

APPEARANCES:                                OF COUNSEL:

Case & Leader, LLP                       Robert G. Raymond, Esq.
107 E. Main Street
P.O. Box 13
Gouverneur, New York 13624-0013
*Attorney for Plaintiff*

Bond, Schoeneck & King, PLLC           Thomas J. Grooms, Esq.
One Lincoln Center
Syracuse, New York 13202-1355
*Attorney for Defendants*

**Norman A. Mordue, Chief U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

    Plaintiff Wendy J. Hay was employed by defendant Burns Cascade Co., Inc. ("Burns

Cascade") from 1980 until she was terminated on July 26, 2005.  In the complaint, plaintiff seeks

damages claiming that defendants violated Title III of the Omnibus Crime Control and Safe

Streets Act of 1968, 18 U.S.C. § 2510-2520, the federal wiretapping statute.  Specifically,

plaintiff alleges that defendants illegally intercepted, disclosed and used plaintiff's private and

personal telephone communications.  Plaintiff also alleges that she was wrongfully terminated

from her employment with Burns Cascade due to the unlawful use of information derived from illegal wiretapping and eavesdropping.[1]  Presently before the Court is defendants' motion (Dkt. No. 25) pursuant to Fed. R. Civ. P. 56(c) seeking summary judgment and dismissal of plaintiff's complaint.

## FACTUAL BACKGROUND[2]

### I.    The Parties

The facts in this case, unless otherwise noted, are undisputed.[3]  Burns Cascade was a distributor of manual, actuated and control valves, as well as instruments, pipe and related products.  Burns Cascade's headquarters was located at 400 Leavenworth Avenue, Syracuse, New York.  Defendant David S. Burns ("Burns") was the Chief Executive Officer and principal shareholder of Burns Cascade.  Defendant David Monahan ("Monahan") was President of Burns Cascade.[4]  Defendant David Doing ("Doing") was the IT Manager for Burns Cascade.  Defendant Timothy Murphy ("Murphy") was Director of Customer Service.[5]

From 1980 until July 26, 2005, plaintiff was employed by Burns Cascade.  Plaintiff was originally employed in the contracting department and later became a Customer Service

---

[1] Plaintiff originally alleged violations of her Fourth Amendment rights and §250.05 of the New York State Penal Code.  On April 5, 2006, the Court approved a stipulation wherein the parties agreed to discontinue those causes of action.

[2] The record contains disputed and undisputed factual information which has been set forth by the parties in their submissions.  However, the Court will summarize and consider only the facts that are material for the purposes of the within motion.  The facts, as discussed herein, are for the relevant time period as referenced in the complaint.

[3] The facts set forth in this section are taken from: (1) the Complaint; (2) the Answer; (3) Defendants' Statement of Material Facts; (4) Plaintiff's Response to Defendants' Statement of Material Facts; (5) the exhibits and evidence submitted by Defendants in support of their Motion for Summary Judgment; and (6) the exhibits and evidence submitted by Plaintiff in Opposition to Defendants' Motion for Summary Judgment.

[4] Monahan became President of Burns Cascade in May 2005.  Prior to May 2005, Monahan was the Vice President of Burns Industrial, the parent company of Burns Cascade.

[5] From April 2005 until August 2005, Murphy was Director of Customer Service.  For 10 years prior, Murphy was employed by Burns Cascade as a customer service representative.

Representative in the Syracuse office.[6]  As a customer service representative, plaintiff reported to Jane Catchpole (previously known as Jane Hammerstedt)[7], David Pollock[8] and Murphy.[9]

In February 2005, plaintiff requested a change in her schedule and asked Lynn Stacjer if she could work "flextime".  Plaintiff testified that Ms. Stacjer made the request but that it was denied.  Plaintiff conceded that she was unhappy with the decision.  In April 2005, Burns Cascade announced a series of organizational and managerial changes.  Of relevance to plaintiff was the promotion of her former co-worker, Murphy, to the position of Customer Service Manager.  With that transition, plaintiff became one of Murphy's direct reports.  Plaintiff was unhappy with that change and made negative comments about defendants and its management team, specifically Murphy and Monahan.  Plaintiff communicated her concerns to Lynn Stajcer and Mr. Pollock.  Plaintiff also made derogatory comments about Murphy to Renee Leggett, the Human Resource Manager.  Some of plaintiff's derogatory comments were made during telephone calls from plaintiff's office telephone.  At the time plaintiff was terminated, plaintiff reported to Murphy.

## II.    The Telephone System

In 1995, Burns Cascade purchased a new central telephone system, known as the AXXESS system, to upgrade telecommunications.  Burns Cascade retained EC Hunter & Associates to provide consultation in connection with the new system.  The telephone system was

---

[6] Plaintiff was employed as a customer service representative for 23 years.

[7] From 1995 until 1998, Ms. Catchpole was the Manager of Operations and Quality for Burns Cascade. From 1998 until 2002, Ms. Catchpole was Corporate Manager for Customer Service and Procurement.  Ms. Catchpole was terminated in March 2002.

[8] From 1994 until May 2005, Mr. Pollock was President of Burns Cascade.  In May 2005, Mr. Pollock became President of Modular Biopharm Systems, a company that is partially owned by Burns Industrial Service.

[9] Plaintiff testified that Lynn Stajcer was "her boss".  However, Renee Leggett, Burns Cascade's Human Resources Manager, testified that Ms. Stajcer "oversaw all customer service and sales for all branches of Burns Cascade not just Syracuse.  Tim Murphy was in charge of Syracuse".

manufactured by Inter-Tel, Inc. and purchased from Internal Telecommunications System, Inc. (also known as ITS).  The system contained features entitled UCD (Uniform Call Distribution) Hunt Groups and ACD (Automatic Call Distribution) Hunt Groups.  With these features, Burns Cascade could create "hunt groups" to segregate personnel and customer service by product family.   The hunt group divisions routed telephone calls in a manner so that each employee received the same amount of calls.  Moreover, if a call came into the office when a employee was not logged onto the telephone system, the call would automatically transfer to the next available agent in that assigned hunt group.  Burns Cascade created hunt groups for customer service, the warehouse and purchasing.

The AXXESS system also contained a built-in call monitoring feature which permitted hunt group supervisors to monitor the telephone calls of individuals in a specified hunt group. The AXXESS Installation and Maintenance Manual, Issue 5.3, June 2001 provided as follows[10]:

UCD Hunt Group Supervisors and Station Monitoring

6.32  The Station Monitor feature allows hunt group supervisors to monitor the calls of anyone in a specified hunt group.  It can be useful in training or in evaluating the performance of hunt group members.

NOTE: As a courtesy, hunt group members should be notified in advance that their calls may be monitored.  In addition, a programmable option can be enabled that sends a tone to the station being monitored whenever the hunt group supervisor joins an ongoing call.  (Note that call monitoring may be illegal in some locations.  It is up to the end user to ensure that use of this feature is in compliance with local laws).

6.33  In database programming, each hunt group can have one or more stations assigned as the hunt group supervisor(s).  The supervisor must reside on the same node as the hunt group members.  The supervisor is usually not a member of the hunt group.   If the supervisor is a member of the hunt group, the Hunt Group Remove/Replace feature can be used at any time without affecting the Station

---

[10] During Ms. Catchpole's deposition, Ms. Catchpole was shown a copy of a portion of the Installation Maintenance Manual for the Axxess System. Ms. Catchpole testified that she had seen the document during her employment with defendants.

Monitor ability.  If desired, one station can be assigned as the supervisor for more than one hunt group.

6.34 To monitor a hunt group member's call, the supervisor enters the Station Monitor feature code (321) and dials an extension number.  The supervisor is then connected to the call and can hear both parties, but cannot be heard by either one. If the monitored call is terminated, transferred, or placed on hold by the hunt group member, the monitor function is terminated.

Defendants' employees did not receive a copy of the manual.  The employees were not told by defendants or any supervisors/managers that their telephone calls could be or would be monitored.

Ms. Catchpole, the Corporate Manager for Customer Service and Procurement, and David Doing provided testimony with regard to the telephone system.   Ms. Catchpole was part of a selection committee that examined different telephone companies and systems.  After the system was installed, Doing became the telephone systems administrator.[11]   Doing testified that as the telephone system administrator, he was responsible for adding and moving phone extensions, troubleshooting, programming the auto attendant feature, adding/removing individuals from hunt groups and running reports.   Doing testified that when he assumed those duties, Ms. Catchpole was the only hunt group supervisor with station monitoring capability.

According to Doing, the system contained programming software which permitted him to add or delete hunt group supervisors.  The software allowed him to open a hunt group icon that displayed the various hunt groups, members of the group and their extensions.  From this icon, Doing could add or remove individuals.  The software for station monitoring was located in an unlocked closet on the first floor in the purchasing area.  Doing also had the programming software for monitoring on his office computer.  Doing testified that he was the only person in the

---

[11] In 1997, Doing was hired by Burns Cascade.  The record does not indicate when Doing assumed responsibilities for the telephone system.

company who knew how to utilize the station monitoring software.  There was no pre-recorded message indicating that a call "may be monitored for quality control purposes" and no tone or other signal indicating that a call was being monitored.

Doing testified that while he was employed with Burns Cascade, the only individuals with station monitoring capability, at various times, were himself, Ms. Catchpole and Monahan.  Ms. Catchpole testified that she was capable of listening to employee telephone calls from the time the system was installed until she was terminated in 2002.  Ms. Catchpole stated that she could only monitor calls from her office and that she only monitored the customer service hunt group.  Ms. Catchpole claimed that she monitored "dozens" of plaintiff's personal and business calls.  Ms. Catchpole could not recall when those calls were intercepted or the sum and substance of any of those calls.  In 2002, Doing monitored two or three telephone calls between Ms. Catchpole and Mr. Pollock.  Monahan utilized the monitoring system on one occasion, July 21, 2005.

The witnesses disagree on the purpose of the monitoring system.  Ms. Catchpole testified that she was directed to monitor employee calls by Mr. Pollock, "to uncover activities or conversations that could be harmful to Burns Cascade, professionally or personally".  Doing testified that the monitoring feature was not for quality control but used for "specific instances", e.g., whether certain individuals were conspiring or whether an employee was being sexually harassed.  Both Monahan and Mr. Pollock testified that the purpose of the monitoring was to ensure customer service effectiveness.

**III.    Code of Conduct**

On February 28, 2000, Burns Cascade distributed a document to their employees entitled "Code of Conduct & Sexual Harassment Policy".[12]  The Code of Conduct reads, in pertinent part:

The following is an outline of Burns Bros. policies and procedures:

9.    For business purposes, management reserves the right to enter, search and/or monitor the private company voice mail, email system, the files/transmission of any employee without advance notice.  All information in the Voice mail, E-Mail and electronic data base system is the property of the Company and should not be considered private or secure for any employee.

The Code of Conduct also contains the following clause:

I agree to abide by Burns Bros. policies and procedures.  I understand that neither this communication nor any other written or verbal communications by a management representative is intended to, in any way, create a contract of employment.  I also understand that Burns Bros. abides by employment-at-will, which permits the Company or the employee to terminate the employment relationship at any time, for any reason.  Burns Bros. will not modify their policy of employment-at-will in any case.

The Code was distributed to employees with an accompanying Memorandum from Renee Leggett, the Human Resources Manager.  The Memorandum read as follows:

In an effort to avoid any misunderstanding, the Company has developed a Code of Conduct.  Under cover is your copy of Burns Bros. Code of Conduct and Sexual Harassment Policies.  Please complete the bottom of this memo, with your signature and date. This will acknowledge, that you have received and read both the Code of Conduct and Sexual Harassment Policies.  Please return this Memo to me, after you have signed and date it, as soon as possible.  If you have any questions regarding the above, please contact me.

Ms. Leggett testified that the purpose of the Code was to inform the employees that the telephones and the internet were for business purposes.  On March 2, 2000, plaintiff signed the bottom of the Memorandum.[13]

---

[12] There is a factual dispute with regard to the interpretation and scope of the Code of Conduct.  The record does not indicate who wrote the Code of Conduct.  Ms. Leggett testified that the Code was authored by Doing and Ms. Catchpole, however, that assertion was not confirmed by either witness during their depositions.

[13] Plaintiff signed the Memorandum as Wendy Stafford, her maiden name.

**IV.     Monitored Telephone Calls**

In early 2005, plaintiff had a conversation with a co-worker, Robert Martin, regarding call monitoring.  The conversation took place at the office, in front of plaintiff's desk.  Plaintiff testified that Mr. Martin learned that Mr. Pollock's telephone conversations were monitored.  Plaintiff claims that Mr. Martin was afraid that, "they might hear him telling me about []meetings and []discussions in the meetings".  Plaintiff testified that other co-workers suspected that defendants were secretly monitoring employee telephone conversations.[14]  Plaintiff claims that a week or two after she was terminated, plaintiff had a telephone conversation with Ms. Catchpole and learned that Ms. Catchpole monitored plaintiff's personal and business conversations.  During her deposition, plaintiff testified that she did not have "firsthand knowledge" that anyone listened to any of her calls.

On July 20, 2005, Monahan asked Doing to add the monitoring software to his office telephone.  Specifically, Monahan wanted to monitor plaintiff's calls.  Monahan testified that he wanted to make sure that plaintiff's "negative demeanor and attitude" were not getting to the customer.  Doing programmed Monahan's office phone and provided Monahan with instructions with regard to operating the monitoring system.  Monahan testified that in order to monitor plaintiff's calls, he   dialed "321" and then dialed "5807", plaintiff's extension, to access her line.  Monahan testified that he used the monitoring feature one time, on July 21, 2005, to monitor one of plaintiff's telephone calls.  Monahan could not recall specifically when he monitored plaintiff's telephone call but stated that it was, "sometime after lunch".  Monahan saw that the monitoring light on his handset for plaintiff's extension was illuminated.  This indicated to Monahan that plaintiff was on the phone.  When he began listening to the call, Monahan did not know whether

---

[14] Plaintiff testified that she did not recall the substance of those conversations or when those conversations occurred.

the call was a personal or business call.  Upon listening to the call, Monahan determined that the conversation was between plaintiff and a male customer.  Monahan testified that he knew it was a customer because it was during work hours and, "there was nothing to indicate that it was anything other than a business call".   Monahan did not ascertain which company the customer was affiliated with or whether or not it was an existing or prospective customer.  Monahan testified that he heard plaintiff say, "I can't believe that these managers - - that these guys are allowed to be managers . . . I've lost all respect for David Burns".  Monahan did not recall the customer's response.  Monahan testified that he listened to the conversation for 30 to 40 seconds.  Monahan never learned the identity of the customer.  A day or two later, Monahan asked Doing to disable the monitoring feature on Monahan's office phone.

In an affidavit, plaintiff stated that during the afternoon of July 21, 2005, plaintiff participated in a total of six phone calls.[15]  Plaintiff averred that five of the phone calls were business calls and one conversation was with her husband.  Plaintiff claims that one of the business calls was with Thomas Morlock, a contact at McCarter Alloys.  Plaintiff denied making any negative comments about Burns Cascade during her conversation with Mr. Morlock.[16]  Plaintiff contends that her husband was the only other male that she spoke with via telephone that afternoon.   Plaintiff's husband, Scott Hay, submitted an affidavit and stated that he had conversations with plaintiff on July 21, 2005 including conversations where plaintiff made negative comments about defendants.

**V.      Plaintiff's Termination**

---

[15] Plaintiff's affidavit was executed on April 11, 2007.  Defendants filed the within motion on March 22, 2007.

[16] The record does not contain an affidavit from Mr. Morlock.

On July 25, 2005, Murphy made the decision to terminate plaintiff.  On July 26, 2005, plaintiff met with Murphy and Ms. Leggett and was advised that she was terminated due to poor job performance.

**DISCUSSION**

**I.      Summary Judgment Standard**

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial.  *See id*.  If the nonmovant fails to carry this burden, summary judgment is appropriate.  *See id*.

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.  *Chertkova v. Conn. Gen 'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

**II.     Admissibility of Affidavits**

Defendants claim that plaintiff has attempted to change the record by producing "after the fact affidavits". Defendants argue that the affidavits submitted by plaintiff in opposition to defendants' motion for summary judgment, including plaintiff's affidavit, Robert Weber's affidavit, Lynette Crown's affidavit and Jane Catchpole's affidavit, should not be considered by the Court.[17] Further, defendants also contend that Attorney Raymond's affidavit is hearsay and should not be considered by the Court.

It is well settled in the Second Circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment. *Mack v. U.S.*, 814 F.2d 120, 124 (2d Cir. 1987) (internal citations omitted). If a party, who has been examined at length on deposition, could raise an issue of fact simply by submitting an affidavit that, by omission or addition, contradicted his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969). However, this principle does not apply if the deposition and the later sworn statement are not actually contradictory. *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000) (internal citation omitted) (holding that where the deponents responses were ambiguous, subsequent clarification by affidavit was permissible).

Courts have recognized that "a material issue of fact may be revealed by a subsequent sworn testimony that amplifies or explains, but does not merely contradict, prior testimony, especially where the party was not previously asked sufficiently precise questions to elicit the amplification or explanation." *F.D.I.C. v. Wrapwell Corp.*, 2002 WL 14365, at *15 (S.D.N.Y. 2002) (quoting *Rule v. Brine*, 85 F.3d 1002, 1011 (2d Cir. 1996)). Moreover, while a party

---

[17] Plaintiff's opposition papers also include an affidavit plaintiff's husband, Scott Hay. Defendants do not argue that this affidavit should be rejected by the Court.

cannot assert "sham issues of fact" to avoid summary judgment, "a party's deposition testimony as to a given fact does not foreclose a trial . . . where that testimony is contradicted by evidence other than the deponent's subsequent affidavit, for when such other evidence is available, the concern that the proffered issue of fact is a mere 'sham' is alleviated". *Sea Trade Co. Ltd. v. FleetBoston Fin. Corp.*, 2008 WL 4129620, at *20 (S.D.N.Y. 2008) (quoting *Palazzo*, 232 F.3d at 44).

Upon review of the record, the Court concludes that plaintiff's post-motion affidavit does not entirely contradict plaintiff's prior deposition testimony. Specifically, paragraphs 9 through 11 of plaintiff's affidavit contain facts with regard to plaintiff's telephone conversations during the afternoon of July 21, 2005. During plaintiff's deposition, counsel for defendants presented plaintiff with a list of telephone calls made from or received at her workstation from April 2005 until July 2005.[18] Counsel made specific inquiries regarding plaintiff's personal telephone calls on July 21, 2005, but made no inquiries with regard to plaintiff's business calls on the same day. According to the record, between 12:17 p.m. and 4:27 p.m., 16 phone calls were either placed to or received from plaintiff's workstation. Plaintiff testified that two of the calls were with her husband and one telephone call was with her doctor's office. Plaintiff was not asked any questions with regard to the remaining telephone numbers or calls. Counsel had a full opportunity to question plaintiff and to explore the nature of the remaining calls. Based upon the record, the Court finds plaintiff's affidavit to be an amplification of her prior testimony as it does not present newly discovered or contradictory facts with regard to plaintiff's July 21, 2005 telephone calls. Moreover, plaintiff's affidavit is supported by Scott Hay's affidavit.[19]

---

[18] The list, which was annexed to plaintiff's opposition papers, was identified by plaintiff at her deposition. The list was for extension 5807, which plaintiff testified was her work extension.

[19] Mr. Hay is not a party to the action and was not previously deposed in this matter.

12

Consequently, the Court will consider the portions of plaintiff's affidavit that are not contrary to her prior deposition testimony. *See Sheinbrot v. Pfeffer*, 1995 WL 432608, at *3 (E.D.N.Y. 1995).

The Court does not reach the same conclusion with respect to Ms. Catchpole's post-deposition affidavit. A review of the record reveals that the affidavit does not provide facts or information that amplify Ms. Catchpole's prior deposition testimony. Moreover, Ms. Catchpole's post-deposition affidavit contradicts her prior testimony and contains new facts including an exhibit which was not identified or utilized during Ms. Catchpole's deposition testimony. Ms. Catchpole's post-deposition affidavit is not corroborated with any other evidence. Accordingly, the Court will not consider any portion of Ms. Catchpole's post-deposition affidavit in the context of this motion.

With regard to Mr. Weber's affidavit and Ms. Crown's affidavit, the Court notes that neither Mr. Weber nor Ms. Crown are parties to the action. In addition, neither witness was previously deposed in this matter. Therefore, their affidavits, to the extent relevant, may be considered by the court on this motion. *See Rivera v. Ndola Pharmacy Corp*., 497 F.Supp.2d 381, 390 n. 8 (E.D.N.Y. 2007) (the court considered an affidavit from a witness who had not been previously deposed and was not a party to the action).

Finally, with regard to Attorney Raymond's affidavit and the substance therein, the Court agrees with defendants. Rule 56(e) specifically requires that affidavits in summary judgment motions be based upon personal knowledge. *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986). An attorney's affidavit not made on his own personal knowledge of the facts, but merely stating what he believes or what he intends to prove at trial, does not measure up to the requirements of Rule 56(e). *Isaacs v. Mid Am. Body & Equip. Co.*, 720 F.Supp. 255, 257

(E.D.N.Y. 1989) (internal citation omitted).  The test for admissibility is whether a reasonable

trier of fact could believe the witness had personal knowledge.  *Searles v. First Fortis Life Ins.*

*Co.*, 98 F.Supp.2d 456, 461 (S.D.N.Y. 2000).

In this case, Attorney Raymond's affidavit contains a description of the substance of an

alleged telephone call between plaintiff and Thomas Morlock.  Attorney Raymond does not

contend that he was a party to that phone call.  Moreover, the record does not contain any

affidavit from Mr. Morlock.  Consequently, the Court will not consider any portion of Attorney

Raymond's affidavit as it is not based upon personal knowledge and in violation of Rule 56(e).

## III.    18 U.S.C. §§ 2511 - 2520

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, also known as the

Federal Wiretapping Act, prohibits the intentional interception of wire communications, including

telephone conversations, in the absence of a court order.  *U.S. v. Willoughby*, 860 F.2d 15, 19 (2d

Cir. 1988).  The statute provides, *inter alia*, civil and criminal penalties for any person who:

> (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, oral or electronic communication;

> (b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication;

> (c) intentionally discloses or endeavors to disclose, to any other person the contents of any wire, oral or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of this subsection; or

> (d) intentionally uses or endeavors to use the contents of any wire, oral or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of this subsection.

See 18 U.S.C. §§ 2511(1)(a)-(d), 2520(a), 2511(4); *see also Arias v. Mut. Cent. Alarm Serv., Inc*.,

202 F.3d 553, 556-557 (2d Cir. 2000).  Intercept is defined as "the aural or other acquisition of

the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device".  18 U.S.C. § 2510(4).  Telephone conversations are wire communications within the meaning of the statute.  *Sheinbrot,* 1995 WL 432608, at *3 (citing 18 U.S.C. § 2510(1)).  A plaintiff in a Title III action is not a spokesperson for others whose conversations were also intercepted and may only assert her rights.  *See Janecka v. Franklin*, 684 F.Supp. 24, 27 (S.D.N.Y. 1987).  Title III provides specific exceptions to liability under § 2511 for certain activities and conduct.  *See* 18 U.S.C. § 2511(1).  In this case, defendants do not deny that they intentionally intercepted plaintiff's calls but argue that no violation occurred because defendants' activities fell within two statutory exceptions: the consent exemption and the business extension exemption.  *See* 18 U.S.C. §§ 2511(2)(d) and 2511(5)(a)(i).

### A.    Consent

Defendants argue that plaintiff consented, impliedly or expressly, to any interception of her telephone calls during the course of her employment.  Plaintiff argues that genuine issues of material fact exist with regard to whether or not she consented to the interception of her calls, thereby precluding an award of summary judgment.

The prohibition against interception of a wire communication does not apply when "one of the parties to the communication has given prior consent to such interception".  *See Willoughby*, 860 F.2d at 19 (citing 18 U.S.C. § 2511(2)(d)).  Such consent may be express or implied. *U.S. v. Rittweger*, 258 F.Supp.2d 345, 354 (S.D.N.Y. 2003).  Consent may be obtained for any interception, and the personal or business nature of the call is irrelevant.  *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 580 (11th Cir. 1983).  Implied consent should not be casually inferred and may be limited.  *Williams v. Poulous*, 11 F.3d 271, 281 (1ˢᵗ Cir. 1991) (internal citations omitted); *see also Watkins*, 704 F.2d at 582.

15

Implied consent is not constructive consent, but rather, "consent in fact" which is inferred "from surrounding circumstances indicating that the [party] knowingly agreed to the surveillance". *Griggs-Ryan v. Smith*, 904 F.2d 112, 116 (1st Cir. 1990) (internal citation omitted) (holding that the implication of consent will ordinarily include language or acts which tend to prove (or disprove) that a party knows of, or assents to, encroachments on the routine expectation that conversations are private).  Knowledge of the capability of monitoring alone cannot be considered implied consent.  *Watkins*, 704 F.2d at 581; *see also Sheinbrot*, 1995 WL 432608 at *4 (the plaintiff's consent could not be implied from the fact that the defendant's multi-line phone system permitted the defendant to eavesdrop unless the privacy option was activated).  Consent may not be inferred if an employee is not informed:  (1) of the manner in which the monitoring is conducted; and (2) that she/he would be subject to such monitoring.  *See Williams*, 11 F.3d at 281-282 (holding that the defendant was not protected by the consent exception where the plaintiff was only aware that calls were monitored but not the manner in which the monitoring was conducted or that he would be monitored).  It must be left to trial to determine the scope of plaintiff's consent, if any, to the monitoring of her phone calls and the extent to which defendants may have overstepped the scope of such consent.  *See Smith v. Devers*, 2002 WL 75803 at *3 (M.D. Ala. 2002) (holding that the issue of consent could not be resolved on summary judgment as plaintiff claimed she was not on notice of the practice of recording conversations and further, that she did not receive a company handbook that detailed the phone monitoring equipment).

In *Ali v. Douglas Cable Commc'n*, 929 F.Supp. 1362, 1377 (D.Kan. 1996), the district court analyzed the consent exemption in a case with strikingly similar facts.[20]  In *Ali*, the defendant/employer, DCC, claimed that it monitored its customer service representatives (CSRs)

---

[20] As discussed *infra*, defendants cite to the *Ali* case as support for the business extension exemption.

calls for training purposes.  *Id*. at 1373.  The defendant claimed that if the call was personal in

nature, the monitoring would be terminated.  *Id*.  The company later decided to record CSR's

conversations.  *Id*.  On April 6, 1993, the defendants distributed a memorandum that stated that a

recording device was installed and further, that the CSR's calls, including plaintiffs' calls, would

be recorded.  *Ali*, 929 F.Supp. at 1373.  Plaintiffs claimed that they became aware of the

memorandum after the defendant recorded 1 - 1 ½ hours of telephone calls for each plaintiff.  *Id*.

The evidence demonstrated that the monitoring and recording were done without beep tones or

other signals indicating their use.  *Id*. at 1377.  Further, there were no labels on the CSRs' phones

or other written policies distributed to the CSRs that warned them of monitoring and/or recording

of telephone calls and that cautioned them against making personal phone calls at their desks.  *Id*.

The district court analyzed Title III and the consent exemption with regard to the

monitoring of calls and concluded:

> It is uncontroverted that some of the CSRs knew of the defendants' monitoring
> practice while other CSRs did not. The circumstances under which certain CSRs
> learned of the monitoring goes to the plaintiffs' credibility in denying knowledge, for
> it is controverted whether the defendants formally announced they would monitor
> CSRs' calls and whether the defendants established a formal policy or procedure for
> monitoring CSRs' calls which was communicated to the CSRs.

> The evidence is enough to create a genuine issue of material fact whether the
> plaintiffs consented to the monitoring of their telephone calls.

*Ali*, 929 F.Supp. at 1376 - 1377.  The Court also found that the evidence was insufficient to infer,

as a matter of law, that the plaintiffs had impliedly consented to any recording of their calls.  *Id*.

The Court reasoned that the April 1993 memorandum did not disclose the manner in which the

recording equipment would be used and further, the plaintiffs alleged that they were unaware of

the memorandum until after some of their calls were recorded.  *Id*.  The Court held:

> In sum, the plaintiffs have come forth with sufficient evidence suggesting the
> absence of either full knowledge or adequate notification, from which consent can

> be implied. Neither plaintiff was in an actual position where he or she necessarily
> would have learned of the monitoring. . . Nor does DCC offer evidence of the CSRs
> openly and frequently discussing the monitoring and recording as a routine and
> pervasive practice at DCC. Genuine issues of material fact surround the consent
> exception.

*Id*.

Defendants argue that the Court may infer that plaintiff impliedly consented to the interception because plaintiff was aware that defendants were capable of listening to employees' phone calls and further, plaintiff was aware that defendants had previously monitored calls in the workplace.   Defendants also claim that the Code of Conduct, which plaintiff signed, further establishes that plaintiff impliedly consented to the monitoring of her telephone calls.   Plaintiff contends that the surrounding circumstances do not convincingly demonstrate that she consented to the interception of her calls.   Plaintiff further argues that her consent cannot be implied by an isolated document which she signed five years prior to the interception.

In the case at hand, plaintiff has not acknowledged or conceded that she knew her conversations were monitored.   Based upon the record, in early 2005, plaintiff was aware through conversations with co-workers, that defendants may be or were capable of monitoring conversations.   The record establishes that defendants did not inform plaintiff that her telephone conversations were monitored.[21]   Further, there were no tones or other signals that would indicate to plaintiff that her call was being monitored.   The record further establishes that plaintiff only became aware that her telephone conversations were monitored after she was terminated.   Moreover, the record is devoid of any evidence that plaintiff was aware of how her calls were monitored.

---

[21] Ms. Crown and Mr. Weber submitted affidavits stating that they were not informed by defendants or any members of defendants management team that their conversations would be monitored for any reason.

Defendants further contend that plaintiff had no expectation of privacy in any of defendants' business systems because she signed the Code of Conduct.[22]  The record establishes a clear disagreement between the parties and witnesses with regard to the scope of the Code of Conduct and most significantly, the parties and witnesses disagree on the interpretation of the word "transmission".  Ms. Catchpole testified that the Code of Conduct never mentioned anything about telephone calls being monitored.  Murphy testified that a transmission "could mean anything".  Doing testified that the Code of Conduct alerted employees that their calls might be monitored and stated that a call to an employee was a "transmission".  Ms. Leggett testified that telephone calls were transmissions.   Based upon the record, there is an issue of fact which would preclude a reasonable fact finder from concluding that Burns Cascade's Code of Conduct informed plaintiff that her telephone calls would be monitored.

Defendants admit that the Code of Conduct "could have been more artfully drafted" but argue that the policy placed plaintiff on notice that the telephone system could be monitored. Defendants rely upon the case of *Perkins-Carrillo v. Systemax, Inc.*, 2006 WL 1553957 (N.D.Ga. 2006).  Defendants contend that the holding of *Perkins* applies to the facts at hand as the language in Burns Cascade's Code of Conduct is analogous to the defendant's policy in the *Perkins* case. However, the facts of *Perkins* are inapposite.  In *Perkins*, despite the vague language in the defendant's policy, the plaintiff conceded that the Electronic Communications Policy allowed unlimited monitoring of her telephone calls.  In the case at hand, plaintiff does not concede that the Code of Conduct or any other policy set forth by defendants notified plaintiff of any monitoring.  As in the *Ali* case, there are genuine issues of fact surrounding whether or not the

---

[22] Plaintiff testified that she had no recollection of reviewing or signing the Code of Conduct but did not deny that it contained her signature.

Code of conduct adequately notified plaintiff that defendants could or would monitor her telephone calls.

Consequently, the Court finds there is no clear basis in the record from which a reasonable fact finder could conclude that plaintiff impliedly or expressly consented to the monitoring of her calls.  Accordingly, defendants' motion for summary judgment on this issue is denied.

### B.      Business Extension Exemption

In the alternative, defendants argue that even assuming plaintiff did not consent to the monitoring of her calls, the interception of plaintiff's July 21, 2005 telephone call falls within the business extension exemption.  Plaintiff argues that the exception does not apply because the subject call was a personal call.  Further, plaintiff contends that the monitoring was covert, sporadic and not undertaken for a valid business purpose.[23]

Section § 2510(5) provides, in pertinent part:

(5) "electronic, mechanical or other device" means any device or apparatus which can be used to intercept a wire or oral communication other than -

(a) any telephone or telegraph instrument, equipment or facility, or any component thereof (i) furnished to the subscriber or user by a provider or wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business.

*See* 18 U.S.C. § 2510(5)(a).  This is known as the "extension phone exception," *Briggs v. Am. Air Filter Co., Inc.*, 630 F.2d 414, 425 (5th Cir. 1980), or the "business extension exemption." *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 580 (11th Cir. 1983).  An employer seeking to invoke this exception to be relieved from liability for the interception of telephone calls in the workplace, must prove two elements: (1) that the intercepting equipment was furnished to the

---

[23] Plaintiff argues that defendants also intercepted "dozens" of plaintiff's telephone calls as well as telephone calls of other Burns Cascade employees without "valid business purposes".  However, it is unnecessary for the Court to address those allegations as the issue at hand is whether or not the interception of the July 21, 2005 call was in the ordinary course of business.  *See Watkins*, 704 F.2d at 582.

user by the phone company or connected to the phone line; and (2) that it was used in the ordinary course of business. *See Deal v. Spears*, 980 F.2d 1153, 1157 (8th Cir. 1992). Consent is not a requirement into the ordinary course of business analysis. *Arias,* 202 F.3d at 559. With regard to the applicability of the exemption, summary judgment is not appropriate where there are genuine issues of material fact as to the nature of the telephone call. *See Fischer v. Mt. Olive Lutheran Church, Inc*., 207 F.Supp.2d 914, 923 (W.D. Wis. 2002) (the parties could not agree on whether the monitored phone call was a personal or business call and therefore, the court could not conclude that the conversation was business in nature).

The phrase "ordinary course of business", has been discussed and interpreted by the Circuit Courts in cases where the nature of the call was established. In *Briggs v. Am. Air Filter Co., Inc*., 630 F.2d 414, 420 (5th Cir. 1980), the parties stipulated that the subject phone call was a business call. The Fifth Circuit granted summary judgment to the employer pursuant to the "ordinary course of business" exception but limited the holding to cases:

> when an employee's supervisor has particular suspicions about confidential information being disclosed to a business competitor, has warned the employee not to disclose such information, has reason to believe that the employee is continuing to disclose the information, and knows that a particular phone call is with an agent of the competitor, it is within the ordinary course of business to listen in on an extension phone for at least so long as the call involves the type of information he fears is being disclosed.

*Id*.

While *Briggs* dealt with the interception of a business call, the 11th Circuit addressed the issue of whether the contents of an employee's personal call could ever be monitored by an employer in the ordinary course of business. *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 582 (11th Cir. 1983). In *Watkins*, the subject call was between the employee and a personal friend. The topics discussed were mainly social however, the defendant argued that the parties also

discussed the plaintiff's interview with another employer and thus, it was obviously of interest and concern to the defendants. *Id.* The Court concluded that the phrase "in the ordinary course of business" cannot be expanded to mean anything that interests a company. *Id.* The Court refused to extend the "business extension exemption" as broadly as the defendant suggested:

> We hold that a personal call may not be intercepted in the ordinary course of business under the exemption in section 2510(5)(a)(i), except to the extent necessary to guard against unauthorized use of the telephone or to determine whether a call is personal or not. In other words, a personal call may be intercepted in the ordinary course of business to determine its nature but never its contents.

*Watkins*, 704 F.2d at 583-584. The Court found that the defendant was justified in listening to, "that portion of the call which indicated it was not a business call, however, beyond that, the defendant was not". *Id.* The Court held that the determination of the relevant points of the call was for the trier of fact. *Watkins*, 704 F.2d at 584.

The 11th Circuit applied the *Watkins* holding to a case involving a telephone conversation between co-workers. In *Epps v. St. Mary's Hosp.*, 802 F.2d 412, 417 (11th Cir. 1986), the subject call occurred during office hours, between employees, over a specialized extension and concerned scurrilous remarks about supervisors. The Eleventh Circuit concluded that the telephone call at issue was not a personal call and held that the case was within the exception because, "the potential contamination of a working environment is a matter in which the employer has a legal interest". *Id.*

The Circuit Courts have also addressed the continual interception of employees telephone calls. In the case of *Deal v. Spears*, 980 F.2d 1153, 1158 (8th Cir. 1992), the defendant claimed that the plaintiff's telephone calls were intercepted for legitimate business reasons - the defendant suspected that the plaintiff was involved in a burglary at the store and further, that the plaintiff was abusing her phone privileges with numerous personal calls. The Eighth Circuit followed the

holding of *Watkins* and concluded that even though an employer may have a legitimate business interest in monitoring a call, the monitoring was only permitted to the extent necessary to determine if the call was personal or made/received in violation of store policy. *Id.* The Court concluded that the defendant's interception and recording of twenty-two hours of the plaintiff's calls, regardless of their relation to business interests, was beyond the boundaries of the ordinary course of business. *Id.*

The Fourth Circuit addressed the issue of 24-hour monitoring and held that if covert monitoring is to take place, it must itself be justified by a valid business purpose or, at least must be shown to be undertaken normally. *Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 741 (4th Cir. 1994) (holding that the defendant's fear of bomb threats was not a valid business reason for the 24-hour interception of calls as the defendant notified only supervisors, and not all employees of the use of the recording device).

In the Second Circuit case of *Arias v. Mut. Cent. Alarm Serv., Inc.*, 202 F.3d 553, 554 (2d Cir. 2000), the defendant/employer was engaged in the business of monitoring burglar and fire alarms of its customers and alerting the police, fire or emergency services. The plaintiffs, employees of the defendant, alleged that their private and personal telephone conversations were continually recorded by the defendant. *Id.* at 554. The Second Circuit cited to the holding of *Sanders* and found that based upon the nature of the defendant's business, there were legitimate business reasons for the 24-hour recording of all incoming and outgoing calls.[24] The Court noted

---

[24] The Second Circuit quoted *Sanders* as cited in the case of *Berry v. Funk*, 146 F.3d 1003, 1009 (D.C. Cir. 1998). In *Berry*, the defendant argued that the intercepted calls were business calls and therefore, the monitoring "was *ipso facto* in the ordinary course of business". *Id.* The Court disagreed with the limited interpretation of "ordinary course of business" defined by the 11th Circuit in *Epps*. *Id.* The Court noted that *Epps*, "did seem to stand for the general principle that any call whose subject is business, if monitored, is necessarily done in the ordinary course of business". *Id.* Rather, the D.C. Circuit Court agreed with the 4th Circuit holding in *Sanders* and concluded that any monitoring must be justified by a valid business purpose and shown to be undertaken normally. *Berry*, 146 F.3d at 1010.

23

that police and other authorities relied upon the records of the calls in conducting investigations. Further, there was no dispute that it was the standard practice within the central station alarm industry to record conversations and, in fact, it was recommended. *Id*. Therefore, the Second Circuit affirmed the district court's award of summary judgment to the employer based upon the business extension exemption. *Id*. at 559.

In the case at hand, defendants argue that regardless of the nature of the telephone call, the business exemption exception applies.  First, defendants argue that the subject telephone call was a business call.  Therefore, defendants allege that plaintiff's "downward spiral" provided defendants with a reasonable, good faith basis for monitoring her call on July 21, 2005. Defendants claim that they, "needed to ascertain whether plaintiff's negative attitude was being passed on in telephone conversations with customers".  In the alternative, defendants claim that even if the subject telephone call was a personal call, the monitoring was acceptable because defendants did not monitor the call past the point of determining that the call was personal.

With regard to the first prong of the business extension exception, the record reveals that the telephone system was purchased from ITS, a distributor for Inter-Tel, Inc.  Defendants argue that the telephone system was equipped with a station monitoring feature and that no extraneous equipment was added to the system.  Plaintiffs do not present any evidence to the contrary.

With regard to the second prong of the exemption, the Court must address whether or not the equipment was used in the ordinary course of business.  The parties present dramatically different accounts of the nature of the subject call.  Defendants claim that the subject call was a business call.  Monahan identified the call as a "business call" because it took place during work hours and Monahan claimed that nothing that was said during the conversation led him to believe that, "it was anything but business".  Monahan recalled that plaintiff made negative comments

about David Burns and the managers at Burns Cascade.  However, Monahan could not identify the male customer, the name of the company that the male represented or whether not the male customer was an existing or prospective customer.  Moreover, Monahan could not recall anything that the male customer said during the telephone call.  Monahan testified that he monitored the call for 30 to 40 seconds.

Based upon defendants' description of the content of the monitored call, plaintiff contends that the subject phone call was personal.  During the afternoon of July 21, 2005, plaintiff claims that she had one telephone conversation with a male customer.  Plaintiff identified the customer as Thomas Morlock, a contact at McCarter Alloys.[25]  Plaintiff does not deny that she made derogatory statements about her managers on July 21, 2005.  However, plaintiff claims that she did not say anything negative about the company in her conversation with Mr. Morlock.  Plaintiff claims that the only other male she spoke with that afternoon, via telephone, was her husband.  Plaintiff's husband, Scott Hay, submitted an affidavit and stated that he had conversations with plaintiff on July 21, 2005 including conversations where plaintiff made negative comments about defendants.

Viewing the evidence in a light most favorable to plaintiff, it cannot be said that no rational jury could find in plaintiff's favor on the issue of the nature of the telephone call.  The record presents a question of fact as to whether or not the subject telephone call was a business or personal call.  Based upon the record and plaintiff's admission that she made derogatory statements about defendants and defendants managers via her workstation telephone, defendants may have had a valid business reason for monitoring plaintiff's telephone calls.  However, as defendants have not met their burden and established that the call was a business call, the Court is

_____

[25] The record does not contain an affidavit from Thomas Morlock.

25

unable to analyze whether or not defendants concern about plaintiff's negativity and demeanor was a legitimate business reason to monitor plaintiff's calls.

In the alternative, defendants argue that even assuming that the phone call was personal, the business extension exemption still applies. Defendants contend that Monahan's monitoring was "extremely limited in duration and lasted only long enough for Monahan to hear [plaintiff] denigrate her managers". Defendants seemingly argue that because Monahan monitored the call for 30 to 40 seconds, the call was not monitored "beyond determining the nature of the call". On this record, the Court cannot make this determination as a matter of law. As stated in *Watkins*, a personal call may not be intercepted in the ordinary course of business unless necessary to guard against unauthorized use of the telephone or to determine that the call is personal in nature. *See Deal*, 980 F.2d at 1158 (quoting *Watkins*, 704 F.2d at 583). Defendants do not argue that plaintiff abused telephone privileges with personal telephone calls or otherwise engaged in unauthorized use of the telephone system. As previously noted, there is an issue of fact with regard to the nature of the call. Therefore, the Court is unable to conclude that the call was only monitored to the point of determining its nature. Moreover, the time at which defendants should have ceased listening is a question of fact that cannot be determined on a motion for summary judgment. *See Fisher*, 207 F.Supp.2d at 923 (citing *Watkins*, 704 F.2d at 584) (holding that the supervisor was obliged to cease listening as soon as she had determined that the call was personal, regardless of the contents of the conversation).

The factual disputes in this matter render this Court unable to conclude, as a matter of law, that defendants actions fell within the statutory exceptions. Therefore, defendants' motion for summary judgment and dismissal of plaintiff's causes of action pursuant to Fed.R.Civ.Pro. 56(c) is denied.

**IV.     At-Will Employment and Plaintiff's Third Cause of Action**

In the third cause of action, plaintiff alleges that defendants wrongfully terminated her "without good and just cause".  Defendants argue that the issue of whether or not plaintiff was terminated for just cause is immaterial.  Rather, defendants contend that plaintiff's employment with Burns Cascade was "at-will" and could be terminated by defendants at any time.[26]

It is settled law in New York that, absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party. *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 333 (1987).   An exception to the employment-at-will rule exists for an implied contract, e.g., if assurances of job security are made by the employer, coupled with express provisions in an employee manual limiting an employer's ability to terminate at will, and the employee relies on these assurances.  *See Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 465-66 (1982).  An employee alleging a breach of implied contract must prove that:  (1) an express written policy limiting the employer's right of discharge exists; (2) the employer (or one of its authorized representatives) made the employee aware of this policy; and (3) the employee detrimentally relied on the policy in accepting or continuing employment. *Baron v. Port Auth. of N.Y. and N.J.*, 271 F.3d 81, 85 (2d Cir. 2001) (citation omitted).

Oral assurances of lifetime employment, or a suggestion that an employee would be fired only for cause, without more, are insufficient to support a claim for breach of employment contract under New York law.  *Wanamaker v. Columbian Rope Co.*, 907 F.Supp. 522, 538 (N.D.N.Y. 1995) *aff'd*, 108 F.3d 462 (2d Cir. 1997); *see also Townsend v. Harrison Radiator Div., Gen. Motors Corp.*, 760 F.Supp. 286, 292 (W.D.N.Y. 1991) (the court rejected plaintiff's

---

[26] Plaintiff's submissions in opposition to defendants' motion for summary judgment do not address or present any argument in response to this portion of defendants' motion.  Therefore, in analyzing this argument, the Court relies upon the allegations in plaintiff's complaint and plaintiff's deposition testimony.

allegation that his contractual right to be subject to discharge only for just cause stemmed from what constituted general policy statements, objectives or procedures aimed not at dismissal but at continued employment as the plaintiff could not identify express language showing the existence of a contractual right limiting the defendant's recognized right to discharge him at will); *see also O'Connor v. Eastman Kodak Co.*, 65 N.Y.2d 724, 725 -726 (1985) (plaintiff erroneously relied upon the popular perception of Kodak as a "womb to tomb" employer and its "Performance Appraisal System" requiring periodic evaluations of each employee).

In this case, plaintiff alleges in Paragraph 36 of the complaint that she, "reasonably relied upon Defendants' representations, policies, employment practices and/or procedures that she would not be terminated without good and just cause". During plaintiff's deposition, plaintiff testified that she was unaware of any document from Burns Cascade that provided that she could not be terminated without good or just cause. Plaintiff testified that the basis for her claim in Paragraph 36 was that, "I was never spoken to about my work, ever". As stated previously, the Code of Conduct contained a paragraph with regard to employment-at-will. During her deposition, plaintiff admitted that she executed the Code of Conduct in March 2000. Plaintiff stated that she did not recall signing any document after March 2, 2000 that contradicted the Code of Conduct or defendants' at-will policy.

Accordingly, the Court finds that plaintiff's employment with Burns Cascade was an employment at will and could be freely terminated by either party. Consequently, defendants are entitled to summary judgment and dismissal of the portion of plaintiff's third cause of action that alleges plaintiff could not be terminated without "good and just cause".[27]

---

[27] The Court notes that plaintiff's Third Count also contains an allegation that plaintiff is entitled to damages based upon the, "wrongful termination of the Plaintiff and alleged violations of 18 U.S.C. § 2511. . .". As the Court previously denied defendants' motion for summary judgment based upon 18 U.S.C. § 2511, plaintiff is permitted to proceed on that theory as alleged in the Third Count.

**CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 25) is **GRANTED** with regard to the portion of plaintiff's third cause of action alleging that plaintiff could not be terminated without "good and just cause" and it is further;

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 25) is **DENIED** with regard to plaintiff's claims pursuant to 18 U.S.C. § 2511.

**IT IS SO ORDERED.**

Date:  February 18, 2009

_____
Norman A. Mordue
Chief United States District Court Judge